**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| MICHAEL E. MADERA, | : | Bankruptcy No. 07-17296DWS |
| | : | |
| Debtor. | : | |

## MEMORANDUM OPINION

**BY:  DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Before the Court is the Motion to Dismiss Bankruptcy With a Bar Order and Motion for Sanctions (the "Dismissal Motion") filed by Deutsche Bank National Trust Company, as Trustee of Ameriquest Mortgage Securities, Inc. ("Deutsche") and the Motion for Continuance of the Stay Beyond 30-Day Period (the "Stay Extension Motion ") filed by the Debtor.  For the reasons that follow, the Dismissal Motion shall be granted in part and this case shall be dismissed.  Accordingly, the Stay Extension Motion is moot.

**BACKGROUND**

A motion alleging that a bankruptcy petition has been filed in bad faith often involves a factual and procedural history extending beyond the case in which the dismissal motion

is filed. This case is no different. The debtor, Michael E. Madera ("Michael"), and his wife, Deborah Madera ("Deborah", and together with Michael, the "Maderas") are not strangers to this Court. Combined, they have filed in the past eighteen months, three bankruptcy cases and two adversary proceedings, all in an attempt to stave off foreclosure of their home. I will therefore incorporate by reference my prior findings of fact and take judicial notice of the dockets and documents filed in this and in their prior cases.[1] At all times the Maderas have been represented by the same attorney, David A. Scholl, Esquire.

The Maderas are co-owners of property located at 401 Twin Streams Drive, Warminster, Pennsylvania (the "Residence"). In June 2005, the Maderas refinanced a prior mortgage on the Residence through Ameriquest Mortgage Company ("Ameriquest"). Madera v. Ameriquest Mortgage Co. (In re Madera), 363 B.R. 718, 720-21 (Bankr. E.D.

---

[1] See Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D. Ill. 1993); In re Paolino, 1991 WL 284107, at *12 n. 19 (Bankr. E.D. Pa. 1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir. 1995).

While a court may not take judicial notice *sua sponte* of facts contained in the debtor's file that are disputed, In re Augenbaugh, 125 F.2d 887 (3d Cir. 1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." In re Indian Palms Assoc., 61 F.3d 197, 205 (3d Cir. 1995) (citing Fed.R.Evid. 201(f) advisory committee note (1972 proposed rules). Deutsche has sought and I will take judicial notice of the transcript of Deborah's testimony at a hearing on May 15, 2007.

Moreover, "factual assertions in pleadings, which have not been superceded by amended pleadings, are judicial admissions against the party that made them. Larson v. Gross Bank, 204 B.R. 500, 502 (W.D. Tex. 1996) (statements in schedules). See also In re Musgrove, 187 B.R. 808 (Bankr. N.D. Ga. 1995) (same); In re Leonard, 151 B.R. 639 (Bankr. N.D.N.Y. 1992) (same).

Pa. 2007). The Mortgage was subsequently assigned to Deutsche Bank. Dismissal Motion and Debtor's Answer ¶ 4.[2]

After making one mortgage payment, the Maderas went into default and Ameriquest initiated foreclosure proceedings in the Court of Common Pleas, Bucks County, Pennsylvania. A default foreclosure judgment was entered against Plaintiffs on May 9, 2006. 363 B.R. at 722. A sheriff's sale of the premises was stayed when Deborah filed a petition under Chapter 13 on July 19, 2006, In re Madera, No. 06-13000 ("Deborah's Bankruptcy"). In the context of Deborah's Bankruptcy, the Maderas filed two adversary proceedings alleging violation of federal and state consumer protection statutes, and seeking to rescind the Ameriquest mortgage transaction. Summary judgement was entered against them on both. See Madera v. Ameriquest, 363 B.R. 718 (Bankr. E.D. Pa. Feb. 8, 2007) ("First Adversary") (appeal pending); Madera v. Ameriquest, Adv. No. 07-001, Order dated April 10, 2007. The Chapter 13 Trustee filed two motions to dismiss Deborah's case for failure to make plan payments, which were subsequently resolved through entry of a wage order.

Deutsche obtained relief from stay on June 19, 2007. At a hearing held the month prior (the "Stay Relief Hearing"), certain facts came to light that are relevant to the instant Dismissal Motion. Deborah conceded that no post-petition mortgage payments had been made to Ameriquest, although it appears several of the Maderas' checks were returned or not cashed. Transcript of May 15, 2007 Hearing ("Tr.") at 9. However, rather than holding

---

[2] It is unclear exactly when the mortgage was assigned to Deutsche, though it appears it must have occurred after Deborah's bankruptcy case. For the sake of consistency, I will refer to Ameriquest and Deutsche interchangeably as "Deutsche".

-3-

those mortgage funds, Deborah used them to pay for expenses related to her mother, who Deborah testified was ailing in late 2006 and passed away on March 29, 2007. Tr. at 10-11, 13-15.

The purported death of Deborah's mother did result in a fortuity which Deborah asserted as the basis of a plan to cure the Madera's mortgage arrears. Deborah testified that her mother devised her residence to Deborah and a brother. Deborah testified that the property, located at 1303 Redcone St., Trevose, Pennsylvania (the "Trevose Property"), was unencumbered and all real estate taxes were paid. Tr. at 16.[3] Deborah also testified that in April 2007 she had entered into a listing agreement with a real estate agent, of which her fifty percent of the proceeds would be used to fund her plan. Tr. at 15-16. Being somewhat skeptical of Deborah's ambitious hope of a sale within thirty days, particularly given that the proffered Fourth Amended Plan allowed her until March 2008 to do so, I conducted further inquiry from the bench. Her responses indicated that: (1) her brother had agreed to the sale of the Trevose Property; (2) she was not really sure whether her mother's estate been probated, and therefore whether she had a vested interest in the Trevose Property; and (3) a cousin was the executor of her mother's estate. Tr. at 31-32. She also testified that her brother was developmentally disabled, Tr. at 38, but no further testimony was elicited as to whether this impaired his ability to consent to the sale of the Trevose Property.

---

[3] Deborah testified that she was current on the taxes on the Trevose Property but that she and Michael had not paid the $3,500 annual taxes on the Residence since 2005, in contravention to her Schedule J, which indicates monthly payment of real estate taxes on the Residence. Tr. at 41-42.

-4-

At the end of the Stay Relief Hearing, neither the Chapter 13 Trustee nor Ameriquest – or the Court for that matter – was satisfied with the proffered Fourth Amended Plan that proposed to give the Maderas until March 2008 to sell the Trevose Property with no payments being made on the residential mortgage. However, in the interest of giving Deborah the opportunity to make use of the Trevose Property to fund her plan, I adjourned the hearing to June 19 to allow her to formulate a new plan. However, I made it clear that Deborah must resume current mortgage payments on the Residence, beginning with the June 1, 2007 payment. Tr. 67-68.

On June 19, 2007, the Stay Relief hearing resumed. Deborah failed to attend and had not made the required June 1 mortgage payment. As such, I granted the stay relief motion. Deborah voluntarily dismissed her case on August 14, 2007, and pursuant to 11 U.S.C. § 109(g)(2), was barred from filing a new case for 180 days. The reason for this dismissal, Mr. Scholl now advises the Court, was that Deborah wanted the use of the approximately $3,000 in plan payments being held by the Chapter 13 Trustee and which are returned to the debtor where no plan has been confirmed.

Michael filed his first bankruptcy case, No. 07-15922, on October 10, 2007. He admits that he did so to stay a pending sheriff's sale on the Residence. On November 9, 2007, Deutsche filed a Motion to Dismiss the case as having been filed in bad faith (the "Prior Dismissal Motion"). The Prior Dismissal Motion was scheduled for hearing on December 12. A sheriff's sale of the Residence was scheduled for December 14, 2007. The Chapter 13 plan filed in Michael's first case proposed $100 monthly payments, which

is $400 less than the payments made in Deborah's case. Those payments would only be made until the "sale of the home owned by his late mother's estate," which would allegedly pay all claims filed. No interest in real estate aside from the Residence was listed in Michael's Schedule A or B.

On December 10, 2007, two days before the Prior Dismissal Motion hearing, Michael's first case was dismissed. On December 13, 2007, the day before the pending sheriff's sale, Michael filed this bankruptcy case. The present Dismissal Motion was filed on December 14. The same day, Michael filed the Stay Extension Motion. A hearing was held on both motions on January 24, 2008 and a consolidated record was made.

Only Michael testified at the hearing. Deborah was not present. As in his prior case, Michael's proposed Chapter 13 plan provides for $100 payments[4] pending the sale of his deceased mother's house, located at 1303 Redcone Street, Trevose, Pennsylvania. Michael's mother passed away in 1995.[5] Only after the Court noted a sense of *deja vu* was it revealed that *his* mother's house is in fact the same Trevose Property which Deborah testified belonged to *her* mother and had been devised to *her* and *her* brother. There are numerous contradictions between Michael and Deborah's stories regarding the Trevose Property. Deborah testified that her mother's estate had not yet been probated and that a

---

[4] Michael could not explain why his plan proposed so much less than that proposed in Deborah's case, nor could he state whether his wife would contribute to his plan through a wage order as she had done before.

[5] His interest in this property was not listed on Schedule A or B. After the hearing on the Dismissal Motion, Debtor filed an Amended Schedule B disclosing his interest in his mother's property as well as the stock dividends discussed below.

-6-

cousin was the executor of the will. While Michael did not testify as to the status of his mother's estate, he stated that his uncle, who passed away in 2004, was the executor, thus implying that his mother's estate has been probated.

Michael's interest in the Trevose Property is shared equally with a developmentally disabled brother, much as Deborah had claimed in her case but this time identified as Richard R. Madera, who resided at the Trevose Property until sometime in 2000 or 2001. While Deborah testified as to having the consent of her brother to sell the Trevose Property, Michael testified that he has not seen Richard in four years. When questioned by counsel for the Chapter 13 Trustee as to why he has not attempted to move forward with selling the Trevose Property since 2001, Michael asserted that Richard "sort of went missing." In the next sentence he contradicted himself by stating that Richard and his wife moved to New Jersey.

Michael's brother, unlike the brother Deborah testified to, does not have authority to consent to the sale of the Trevose Property. Michael offered into evidence a letter dated November 21, 2007, from Francine W. Kaplan, Esquire, to Mr. Scholl, stating that Richard's interest in the Trevose Property is subject to a trust. Exhibit. D-2 (the "Trust Letter"). The former trustee, Richard Anthony Madera, passed away in 2004 and no replacement trustee has been appointed. Kaplan's firm has filed a petition to appoint Kim N. Raffaele as the new trustee to Richard's trust so that the Trevose Property can be sold. None of this information was supplied by Deborah when she raised the issue of the Trevose Property in her sworn testimony on May 15, 2007.

Notwithstanding the lack of a trustee to represent his brother's interests, Michael testified that he has a "cash buyer" who is willing to pay $143,000 for the Trevose Property and a realtor ready to handle the transaction.[6] No documentary evidence was presented supporting this offer, and Michael conceded that there was no signed agreement of sale.[7] Michael did not acknowledge or offer any explanation as to the discrepancies between his testimony and that of Deborah with respect to the Trevose Property. Indeed, when questioned about his wife's bankruptcy case, Michael displayed an incredible lack of knowledge, despite the fact that Deborah's case clearly affected the Residence that he lives in and that he was a named plaintiff in the adversary proceedings in that case. He could not even remember when Deborah's mother passed, which according to Deborah occurred less than a year ago. With respect to the Trevose Property, the only finding I can make on this record is that Michael, and not Deborah, has an interest in the Trevose Property. However, I do not believe, without substantiation, the extent of Michael's interest, the value of the Trevose Property, or the existence of a willing buyer.

Moreover, Michael is unwilling to take the steps needed to effectuate a sale of the Trevose Property. The letter from attorney Kaplan asks Michael sign an attached affidavit supporting the appointment of the new trustee. Michael is unwilling to approve of

---

[6] Michael proffered a letter from Lerch & Associates Real Estate stating it would charge $2,500 to handle the sale of the Trevose Property. Exh. D-4.

[7] At the hearing, Michael valued the Trevose Property at $150,000, but provided no factual basis for this value, which is contradictory to his Amended Schedule B. That document discloses a one-half interest valued at $60,000, implying the Trevose Property is worth $120,000. He did not state whether any taxes or other liens would have to first be satisfied from the sale of the Trevose Property. However, a search on Westlaw indicates two judgment liens by Lower Southampton Township.

-8-

Ms. Raffaele because he fears that she will seek a higher purchase price than the offer Michael currently has on the Trevose Property. In addition, he states that Ms. Raffaele was friends with Richard's late wife, who Michael asserts exerted undue influence upon Richard and alienated him from his family. Without addressing the credibility of this testimony, it is at least indicative of an adversarial relationship between Michael and his brother which presents a serious obstacle to liquidation of the Trevose Property.

In addition to the Trevose Property, Michael proffered another potential asset which could fund a plan. He has a claim for $49,000 in stock dividends (the "Stock Dividends") that were held jointly with his mother and have been deposited with the Pennsylvania Treasury Department - Bureau of Unclaimed Property (the "BUP"). He admits that he became aware of the dividends sometime prior to his first bankruptcy case. The BUP sent a letter to Judge Raslavich dated October 26, 2007, referencing Michael's first bankruptcy case number and stating that there were unclaimed funds owed to him. Exhibit D-1. The BUP letter states:

> Dear Sir:
>
> I am writing to inform you that unclaimed property was reported to the [BUP] in the name of Pearl and Michael E. Madera JTN. Pearl Madera is now deceased; therefore the funds now belong solely to Michael E. Madera. The property, which was reported to BUP by Northeast Utilities Services Co., are proceeds from Dividends and Dividend Reinvestment. The Dividends and Dividend Reinvestment in the amount of $49,379.00 were never received by the claimant and were reported to the Treasury Department as unclaimed property.
>
> The claimant, Michael E. Madera, has come forward to claim this money. However, in our research we were able to obtain records showing that

-9-

> Michael E. Madera filed for Chapter 13 Bankruptcy on 10/10/07 . . . By this letter, the Treasury Department is seeking guidance from the Bankruptcy Court on payment of these funds.
>
> Please be advised that if notification of your interest in the unclaimed property is not made to BUP within thirty days of this letter, the claim will be processed for payment
> . . .

Exhibit D-1. Michael testified that he was told by the BUP that he cannot access the Stock Dividends because of this bankruptcy case. I simply do not find this explanation credible. As the letter states, he did try to claim them but BUP discovered his bankruptcy and stated its intention to process Michael's claim absent notice from the Bankruptcy Court. In any event, that case and Trustee were dismissed, and Michael took no action. While he states that he was waiting for his new Trustee (William C. Miller, Esq.) to do something, there is no evidence that Mr. Miller was informed nor that if he was, that he would have done anything. Michael does not explain why he has not notified the BUP to process his claim. Indeed there is no evidence to indicate that the BUP is aware of <u>this</u> bankruptcy case, and Mr. Miller's counsel questioned Michael as to why he had taken no steps to obtain these funds. More significantly, Michael has not disclosed the Stock Dividends in his Schedules in either case nor provided for their use to fund his Chapter 13 plans which rely solely on the Trevose Property to fill the deficiency in his income.

Finally, Michael was unable to explain why he voluntarily dismissed his prior case. Indeed, he had no clue. It was his counsel, Mr. Scholl, who quite candidly explained that the voluntary dismissal was his strategic decision. He did not want to take a chance on losing

the Prior Dismissal Motion and being barred from filing a new case prior to the pending sheriff's sale. Since Deutsche had not filed a motion for relief from stay which would have resulted in a bar order under § 109(g)(2), counsel concluded the "out" and "in" strategy was the safest and a permissible option to avoid the imminent foreclosure.[8]

**DISCUSSION**

Section 1307(c) provides that Chapter 13 petitions may be dismissed "for cause." 11 U.S.C. § 1307(c). In In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996), the Third Circuit held that a debtor's lack of good faith in filing is sufficient cause for dismissal under § 1307(c). Because the term "good faith" is "incapable of precise definition," the good faith inquiry is a fact intensive determination that is left to the discretion of the bankruptcy court. Id. The good faith of Chapter 13 filings is "assessed on a case-by-case basis in light of the totality of the circumstances." Id. To assist the bankruptcy court in its review, the following factors have been identified by the Third Circuit to be among those relevant to the inquiry:

> the nature of the debt ...; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

Id. (*quoting* In re Love, 957 F.2d 1350, 1357 (7th Cir. 1992)). See also Eisen v. Curry

---

[8] Indeed, Scholl commented how fortunate it was that Deutsche's counsel did not have the forethought to file a motion for relief from stay as well as the Prior Dismissal Motion, which would have prevented his strategic filings. See 11 U.S.C. § 109(g)(2).

(In re Eisen), 14 F.3d 469, 470 (9th Cir. 1994) (*quoting* In re Goeb), 675 F.2d 1386, 1391 (9th Cir. 1982)) (whether the debtor "misrepresented facts in his [petition or] plan, unfairly manipulated the Bankruptcy Code or otherwise [filed] his Chapter 13 [petition or] plan in an inequitable manner."). Moreover, "where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose, bad faith exists." In re Dami, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994). In analyzing these factors, Deborah's conduct in her case is equally relevant as Michael's in his cases. E.g. In re Feldman, 309 B.R. 422, 427 (Bankr. E.D.N.Y. 2004) (imputing the non-filing spouse's prior abusive filings to the debtor in determining that the debtor's first case was filed in bad faith); In re Kinney, 51 B.R. 840, 845 (Bankr. C.D. Cal.1985) (finding that the actions of each family member in filing multiple bankruptcies could be imputed to the rest of the family for purposes of determining abuse of the bankruptcy system); In re Wong, 30 B.R. 87, 89 (Bankr. C.D. Cal. 1983) (considering husband and wife's separate filings to determine abuse of the bankruptcy system).

Timing and Debtor's Motive. Together, Michael and Deborah have filed three bankruptcy cases in eighteen months. No mortgage payments were made in the year that Deborah's case was pending while she and Michael litigated their adversary proceedings against Deutsche. When Deutsche secured relief from stay so that her bankruptcy ceased to serve its purpose of obstructing foreclosure, Deborah voluntarily dismissed her case so that she could pocket the $3,000 held in the Trustee's account. Rather than use those funds to negotiate some arrangement with Deutsche, Michael filed his first case, which he freely admits was filed solely to stop the sheriff's sale of the Residence. His counsel admits that

the voluntary dismissal, two days before the Prior Dismissal Motion, was a purposeful strategic action to avoid the hearing and allow Michael to refile in order to once again avoid the rescheduled sheriff's sale.  Mr. Scholl argued that as nothing in the Code expressly prohibited this maneuver, it was a legitimate step to protect the Residence.  To say that I disagree is an understatement.  The absence of a statutory bar to the filing of Michael's second petition does not render that strategy equitable or appropriate.  With absolutely no effort to disguise it, the second bankruptcy filing stands as a conspicuous attempt to unfairly manipulate the Bankruptcy Code to frustrate Deutsche's foreclosure sale.

"The filing of successive petitions in bankruptcy ... may be indicia of a bad faith filing where there is no bona fide change in circumstances that justify the multiple filing or where the subsequent filing was designed to frustrate statutory requirements and abuse the bankruptcy process." In re Coones Ranch, Inc., 138 B.R. 251, 258 (Bankr. D. S.D. 1991). Michael's second case is in no way different from the first.  How could it be, given it was filed only three days later, after a strategic dismissal?  If Michael truly desired to reorganize using the Trevose Property and/or the Stock Dividends, he would not have dismissed his first case.  Rather, he would have testified in support of his plan to demonstrate these then existing and now belatedly claimed "changed circumstances."  That he did not do so is ample evidence that he lacks any real motive to reorganize under Chapter 13.

The Maderas' true intentions are also demonstrated by their utter failure to comply with their statutory duties in bankruptcy.  A cure of any default in a Chapter 13 plan must be done "within a reasonable time and maintenance of payments while the case is pending."

11 U.S.C. § 1322(b)(5) (emphasis added). Through the use of successive bankruptcy cases and bankruptcy litigation, the Maderas have kept Deutsche at bay for two years without making a single post-petition mortgage payment. In May 2007 Deborah testified, upon penalty of perjury, that it was the illness and death of her mother that made it impossible to make the mortgage payments and then in the next breath proffered that timely demise as a silver-lined cloud that would fund a plan to pay Deutsche. Even before the falsity of that testimony was demonstrated through Michael's second case, Deborah demonstrated her lack of good faith by failing to make the June 1 mortgage payment that would have purchased her the time to pursue sale of the Trevose Property. Like Deborah, Michael admits that no post-petition mortgage payments have been paid, but states that he is now willing to start paying it forthwith. How he will do so remains unanswered. His schedule B in both his cases shows a mere $500 in the joint checking account which one would expect to be greater given the absence of this budgeted expense. Clearly the Maderas have not been putting their mortgage payments aside while they attempt to sell the Trevose Property.

I simply do not believe that the Trevose Property, which has been sitting empty since 2001, is likely or even able to be sold in a reasonable amount of time. Michael's testimony that he could not locate his brother to do so is simply not credible. Moreover, Michael is actively frustrating the Trevose Property sale by his refusal to accept Ms. Raffaele as trustee for Richard's trust. Whether it is Ms. Raffaele or not, the ultimately appointed trustee will have a fiduciary duty to Richard to obtain the best possible price for the Trevose Property. That duty may or may not be in harmony with Michael's interest in a "quick" sale to his cash buyer. Michael's attitude as evidenced by his testimony and the protracted history of

the lack of exposure of the Trevose Property for sale present real obstacles to a timely solution to the payment of Deutsche's arrears under a new Chapter 13 plan. Indeed, I find that both Michael and Deborah before him have been disingenuous in proffering the Trevose Property as an asset which will be readily sold under a confirmable chapter 13 plan.

With respect to the Stock Dividends, I reject Michael's attempt to blame his inaction upon the Chapter 13 Trustee. Michael is represented by counsel who could guide Michael through the procedural steps needed to claim the Stock Dividends and make them available to fund the Chapter 13 plan by amending the plan to actually provide as much. The Chapter 13 Trustee, unlike a Chapter 7 trustee, could not claim the Stock Dividends under the Chapter 13 plan in its present form. There is simply no reason for Michael's failure to take affirmative action, leading me to conclude that he has no real interest in using these funds to pay Deutsche. Rather, his plan states his intention that Deutsche simply wait for a sale of the Trevose Property that is not likely to occur at any time soon and hope that it could be sold at a price sufficient to cure the arrears.

Candor to the Court. Together the Maderas have made misrepresentations and omissions of fact. In particular, the circumstances surrounding the Trevose Property are shrouded in a mist of deception. Deborah unequivocally testified that the property interest was *hers* and the Trevose Property became available from the March 29, 2007 death of her mother. To the contrary, Michael's testimony is that the property interest is *his* from the 1995 death of his mother. Deborah testified that the other interest-holder in the Trevose Property had consented to the sale. Michael's testimony makes it clear that has not occurred. Michael and Deborah's stories simply cannot be reconciled.

-15-

Through his counsel Michael responded to the Prior Dismissal Motion in relevant part:

> The Debtor has indicated to counsel for the Movant that he is a recipient of a large unclaimed property claim and has <u>signed an agreement of sale</u> to sell the home of his late mother, both of which will generate sufficient funds to promptly cure any default in payments, and may even be sufficient to satisfy the mortgage balance. <u>These are circumstances</u> which dramatically changed the financial status of the Debtor and his wife <u>subsequent to the dismissal of his wife's bankruptcy case</u>.

Debtor's Answer to Ameriquest Mortgage Company's Motion For Relief from the Automatic Stay [*sic*[9]] and Sanctions, ¶ 4, In re Madera, No. 07-15922, Doc. No. 27 (emphasis added). This assertion is a mix of half-truths and outright falsehood. Michael's testimony clearly established that there is no signed agreement of sale for the Trevose Property. Also contrary to the above the above-quoted statement, which implies that the availability of a sale of the Trevose Property is a changed circumstance, the testimony revealed it has been sitting empty and available for sale since 2001.

I also note that Michael failed to disclose the Stock Dividends on his Schedule B in his last case or on his initially filed Schedule B in this case. Nor did he propose use of these funds in the proposed chapter 13 plan filed in his first case. It was the BUP's own investigation that revealed Michael's first case, which led the BUP to contact Judge Raslavich's chambers. Michael's explanation for his failure to disclose this asset, i.e., that he wasn't sure as to the amount, is unacceptable, and makes me question whether it would have been disclosed had he not thought its existence would "save" his case. Nor does the

---

[9] This is how Mr. Scholl titled his response, but as noted above, no stay relief was sought in the Prior Dismissal Motion. Supra n. 8.

-16-

mere fact that a debtor has the ability to amend schedules at any time under Fed. R. Bankr. P. 1009(a) justify a reckless disregard of a duty to truthfully disclose known assets the first time schedules are filed. Bankruptcy schedules require debtors to verify the disclosures contained in the schedules under penalty of perjury. "By statute, that has the force and effect of an oath." Cepelak v. Sears (In re Sears), 246 B.R. 341, 347 (8th Cir. BAP 2000) (*citing* 28 U.S.C. 1746).

The effect of the Maderas actions upon Deutsche. The Maderas have kept Deutsche at bay for almost two years without making any post-petition payments on a loan they defaulted on after only one payment. Deutsche has been utterly frustrated in its efforts to liquidate a foreclosure judgment that the Maderas have made no attempt to challenge in the state court or to realistically address in bankruptcy. It has incurred attorney's fees and costs associated with filing its relief motion in Deborah's case and the dismissal motions in Michael's cases, cases which have been motivated solely to delay Deutsche and to litigate claims that should have been brought in the state court. See Madera v. Ameriquest, 363 B.R. at 725 (holding that TILA rescission claim was barred by Rooker-Feldman doctrine). While demanding the protection of the bankruptcy law, the Maderas' failure to be truthful to this Court and its processes negates their good faith.

In the Dismissal Motion Deutsche has requested that this case be dismissed with a bar order against Michael filing another case for a period of 180 days. In appropriate circumstances where the facts evidence an abuse of the provisions, purposes and spirit of Chapter 13, this Court has joined other bankruptcy courts that find that more than dismissal is warranted. Dami, 172 B.R. at 11.[10] In such a case, Bankruptcy Rule 9011, incorporating Fed.R.Civ.P.11 provides the authority for the sanction Deutsche seeks. As the Court in In re Jones, 117 B.R. 415, 420 (Bankr. N.D. Ind. 1990) stated:

> [W]here a debtor files a petition in bankruptcy with no intention of obtaining the benefits or the goals for which the proceeding was designed or with no intention of pursuing those proceeding[s] to their natural conclusion, the bankruptcy code is being abused and bankruptcy rule 9011 is being violated.

See also In re Narod, 138 B.R. 478, 482 (E.D. Pa. 1992) (sanctions imposed under Rule 9011 are not limited to expenses or fees). Other courts have relied on their discretionary power under Section 349, see, e.g., In re McKissie, 103 B.R. 189, 193 (Bankr. N.D. Ill. 1989); or Section 105, see, e.g., In re Earl, 140 B.R. 728, 741 (Bankr. N.D. Ind. 1992), to enjoin future filings to prevent abuse of the bankruptcy process. The Court's ability to impose this

---

[10] In Dami, the debtor had filed four unsuccessful bankruptcy cases over 3-1/2 years each on the eve of a mortgage foreclosure proceeding, thereby securing the benefit of the automatic stay to obstruct the mortgagee. His Schedules were replete with not only omissions but false statements about his assets and liabilities, income and expenditures, and his excuses for the state of his documents were found to be "lame and incredible." Importantly, I found that:

> this is the precise type of bankruptcy recidivism that mocks the bankruptcy system. There can be no question that Debtor's conduct is a flagrant abuse of the automatic stay provisions of the Bankruptcy Code, interposed for the sole purpose of harassment and delay and intended to cause Movant great cost and expense.

Id. at 11. This finding is equally applicable here.

-18-

sanction is necessary to maintain the integrity of the bankruptcy process and avoid burdening the court's docket with frivolous cases, thereby depleting valuable and limited court resources which could be channeled to meritorious cases.  This sanction is also necessary to assure that this court should not be a sanctuary for litigants seeking to avoid valid orders of the state court through improper means.  On these facts, I easily conclude that the 180-day bar Deutsche seeks against Michael should be granted.

The Dismissal Motion also seeks monetary sanctions against Michael and Scholl for filing the instant case pursuant to Federal Rule of Bankruptcy Procedure 9011. However, Michael and his attorney correctly note, this request was not proceeded with the requisite demand and opportunity for Michael to withdraw the petition, as required by Rule 9011(c)(1)(A) (the "Safe Harbor Provision").

An Order consistent with the foregoing Memorandum Opinion shall be entered.

                                      DIANE WEISS SIGMUND
                                      Chief U.S. Bankruptcy Judge

Dated:  February 7, 2008

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| MICHAEL E. MADERA, | : | Bankruptcy No. 07-17296DWS |
| | : | |
| Debtor. | : | |

# ORDER

**AND NOW**, this 7th day of February 2008, upon consideration of the Motion to Dismiss Bankruptcy With a Bar Order and Motion for Sanctions (the "Dismissal Motion") filed by Deutsche Bank National Trust Company, as Trustee of Ameriquest Mortgage Securities, Inc. ("Deutsche"), and the Motion for Continuance of the Stay Beyond 30-Day Period (the "Stay Extension Motion") filed by the Debtor, after notice and hearing and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that:

1. The Dismissal Motion is **GRANTED**, and the Chapter 13 case is hereby **DISMISSED**. The Debtor may not file another bankruptcy case for a period of 180 days following entry of this Order. To the extent that the Dismissal Motion seeks monetary sanctions, the request is **DENIED**.

2. The Stay Extension Motion is **MOOT**.

DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge